323-0389 Board of Education of Crete-Monee Community Unit School District 201-U and Crete-Monee Community Unit School District 201-U Appellants by William Gleason v. Shirley Glowacki, Mary Watson, and Kathy Davis are all collectively known as the Committee of 10, appellees by band of women. Good afternoon. Good afternoon, Your Honor and Counsel, and may it please the Court, my name is William Gleason. I represent the Appellant, the Board of Education of Crete-Monee Community Unit School District 201-U. The case we're presenting to Your Honors here involves a detachment proceeding under Article 7-6 of the Illinois School Code. As Your Honors are well aware, the Illinois Constitution requires the legislature to provide free public education to all of its students, and so they've delegated this function to local school districts. And the legislature creates both the board that heard this case, which is the Regional Board of School Trustees of Will County, and it sets forth the procedure that the regional board utilizes when it's creating these boundary decisions. But the issue of boundaries is within the sole and exclusive province of the legislature, and I think that's important for some of the arguments that we'll make before the Court this morning. So the biggest thing here is the procedure under Article 7-6 of the school code, and we believe there were multiple violations of the statute in the hearing, which all would give this court reasonable grounds to reverse the decision of the regional board. And we can start with the most simplistic, which is that the evidence, even if you accept the evidence, which should not have been considered by the regional board, it still was insufficient under Section 7-6 of the school code to grant the detachment petition, so their decision was clearly erroneous in that respect. Going back to the 50s in the Oakdale case, what the court looks at is the overall benefit to the annexing district, where they're looking to go, and it has to clearly outweigh the detriment that's caused to the detaching district. So this sets up something called the benefit detriment test that the Supreme Court has utilized in Carver, and you look at several things, the differences between curricula, the facilities, the effect on the ability to meet state standards, the impact on tax revenues, the distances from homes to schools, and whether the district remained financially healthy. In 2015, as this court knows from its Berle decision, the legislators started to walk back some of the things that you could consider in the Carver analysis. One of the ones you just heard was distances from homes to schools. You can only consider it in certain situations, which we'll discuss today. But if you look at the evidence and you consider just the decision of Carver, the evidence here clearly shows that staying in the Crete-Moniz school district would have been beneficial to the students in the detaching subdivision. Crete-Moniz school district has 30 more elective classes at the high school, so far greater educational opportunities to consider. It has 12 more AP classes at the high school. It has 10 more honors classes at the high school. It has 14 onsite technical education classes, and it has an international baccalaureate program at its middle school. It has five more sports offerings at the high school, four more sports offerings at the middle school, 10 more clubs at the high school, and nine more clubs at the middle school. In other words, the opportunities for the students who live in the subdivision who are trying to leave are far greater at the Crete-Moniz school district than they would if they were allowed to annex into the Piatone district. The student population, is that a factor to be considered or not? The student population in the context of the makeup of it? One school versus the other. I'm sorry, I don't understand your honest question. What is the school population in both districts? The school population in Crete at the high school level is much larger. It's a much larger school district than Piatone. Correct. I guess somebody could try to put on evidence that going to a smaller school is necessarily better and it's an educational benefit. The evidence that they tried to rely upon here was that it's a smaller school that has less disciplinary issues and that it has a lower teacher-to-pupil ratio. That was the educational benefit that the regional board looked at in saying that there's an educational benefit. The problem with it is, as I just listed to you, those are all the traditional CARVER evidence that you would look at. The expert witness that the committee presented didn't weigh all those benefits against the small benefits of there's less discipline and there's a lower teacher-to-pupil ratio. She didn't compare them both and say, well, one exceeds the other. She intentionally testified that she never looked at the curriculum of the two school districts that are competing. She never looked at the programs that the school districts offer. And the folks who signed the petition that testified at the hearing, they hadn't looked at it either. So the evidence that you wanted to go to a different school district because it gave you better opportunities was just absent from the record. But the harm was significant. Because the school district in Creed is going to lose $854,000 a year. So it's going to lose about net 1% of its budget. Now, Creed is a Tier 1 school for purposes of evidence-based funding, which means it's underfunded, according to the legislature. It's funded at about 65.3% of where it should be, or it's underfunded by $22 million. So the state is not giving the district what it says it's supposed to in order to educate its children. And so we're going to take away money. Piatone, on the other hand, is a Tier 3 school. It's 99.1% funded. So the state is giving Piatone all of the resources that it needs to educate its students. So the district is going to lose this money. Just out of curiosity, how is that discrepancy so large, seemingly large? What underlines the discrepancy between state funding between those two districts? It just has to do with the evidence-based funding mechanism and how much general state aid the state gave them traditionally. And as it's ramped up under the new formula, they're still behind with a lot of school districts. And it's usually the school districts with less property values or with a lower socioeconomic group of folks who support the school district, they're usually the ones who are in the Tier 1 situations. And more affluent school districts are in Tiers 3 and 4, where they're either fully funded or overfunded for purposes of state aid. And the issue that becomes when you don't get your state aid is you become more and more reliant on property taxes. So when you lose $864,000 because we're capped by PTEL, we can't just go raise the additional revenue through increased property taxes. We're not authorized by the legislation to do that. So we just lose $854,000 in our budget. And the undisputed testimony was that we're either going to cut programs or we're going to cut teachers. So the thing that the regional board is relying upon to say there's this massive educational benefit, it's a student-to-teacher ratio, ours is going to get worse. So state funding is not an equity or equal funding, is it? It's based upon a formula. So different school districts are getting different amounts of money, and so then you can see how much money per student is there. But it's not equal, it's equitable. Okay. So what we also have is undisputed evidence that our ranking from ISBE, which is utilized in our financial report, is going to go down when we lose $854,000, which causes us to lose more money when we go to bond money. It becomes more expensive because we're not as attractive as a borrower when we have this kind of a deficit. So when you look at the fact that the students really aren't getting any educational benefit to go to the new school district, and the students who are left behind are going to face an $854,000 loss, they're going to lose teachers or programs, the detriment to CREEP to grant this, the benefit, does not clearly outweigh it, it doesn't outweigh it at all. But in addition, there were more violations of the statute that created a massive problem in how the regional board conducted this hearing. As we talked about earlier, they changed the statute in 2015 to say you couldn't consider certain types of evidence when certain factors were present. Section 7-6 small I-1 talks about the school report cards. And these are massive documents that are set forth what's in them under Article 10. And this statute says you cannot allow for the comparison of school or district report cards when there's a 3% difference in minority, low income, and English learner student populations. So that was all true here, and so the regional board understood that it could not consider the school report cards. So they couldn't just come into evidence, because that's what it says. And there's a recent 5th District K-4 event versus Roxanna where they said considering the school report cards themselves was reversible error for the regional board to do so. So here they didn't directly introduce the school report cards, but what they did was they had an expert witness come in, base an opinion about educational benefit based upon reviewing the student report cards, then parroting data from the student report cards to the regional board directly. And then the regional board relied upon the specific data points that the expert had gotten from the school report cards that weren't supposed to come into evidence, and said that demonstrates an educational benefit. So the only two data points they relied upon were the comparison of suspension rates between high schools, and a comparison of the student-teacher ratio between the districts. And when you look at the order, and you look at the citation to where they got it in the record, it's the expert witness testifying directly that I got it from the student or the school report cards. So the petitioners attempted to end-run a statutory exclusion of evidence in a forum created only by the legislature to essentially get around the preclusion. We don't think that they could have even done that. We don't think that an expert could have looked at the data that's excluded specifically by a statute and questioned it and offered opinions on it, but they went even further and introduced all of the evidence of the specific data points that they weren't allowed to consider. This doesn't happen too often in Illinois courts because there's not a lot of statutes that exclude what evidence can come into court because there's a separation of powers problem when the legislature tries to step on your toes that way. That same problem doesn't exist in a forum that's created and only exists because of the legislature. It can restrict the evidence just the way that it wants because it doesn't have to create this structure at all. The only case we could find that we thought was persuasive and could be helpful for your honors was the Wisconsin Supreme Court case, which is the state versus Fisher, and it addressed this question head-on in a context of admitting a PBT test to prove a DUI, and they tried to have an expert say, well, I reviewed the PBT test and I can tell you that the person wasn't intoxicated, and they said, if you do that, the exclusion in the statute of consideration of this evidence goes away, and the same is true here. If you allow the expert witness just to review the report cards and parrot the data into evidence, this exclusion means nothing, and it was important, and the legislature did it intentionally because they wanted you to compare like districts, and if you didn't have like districts like Justice Holgers was talking about earlier, they didn't want you comparing these report cards because they don't think it's fair, and there's a lot of information and data in these report cards, there's test scores, there's a myriad of things, but the things that they relied upon by the expert's testimony were in there, and that was reversible error for them to do it, and frankly, since that's the only evidence that they had of an educational benefit, once you exclude it, they really have no evidence of an educational benefit, but the errors continued, unfortunately. They also violated section 7-6, subparagraph I-2. So I understand it's a foundation for my opinion that was not permitted as your argument, is that correct? Yes. The foundation for the, in this case, for the expert's opinion is precluded, that foundation is precluded by statute, correct? Correct. So I assume all counsel here are pretty familiar with this whole question of why not. So what is left for a, quote, expert to make the claim that there's a better educational environment in the school that wishes to detach? So you'd have to go look at things that weren't reported on in the school report cards, or look at the typical car refactored, which is compare the curricula of the two, compare the offerings that they have. The problem wasn't that there's nothing to compare it with, it's just that the evidence didn't support their petition, because as I already gave your honors, it overwhelmingly supports the fact that Crete-Monet has a far more expansive curriculum and far more expansive programs to offer the students. But there could be argument that a less expansive curriculum creates a better educational outcome, like the ours, okay, the basic education. So there could be argument that the expansive curriculum is not... Sure, I assume somebody could argue that, your honor, but nobody put those facts and evidence in this record. No, it's not in the record, I'm just looking at, you know, what you could use. Sure. The second error is in viewing section 7-6-I-2. It talks about something called the whole child of a community of interest factor in a detachment proceeding, and the statute requires, in order for you to make a significant direct educational benefit to the petitioner's children if detachment were allowed. When you can review the regional board's order here, it never made a finding that there was a significant direct educational benefit. The expert never testified that there was a significant direct educational benefit. So without the finding in the written order, we don't think that the regional board was allowed to consider this factor at all, but it very clearly did. And the purpose of this evidence, even if you wanted to suggest that they could have considered it, is really to see if you can identify the children with the detachment area with where they're seeking to go to school. You know, I looked at the Board of Education of Gulf School District 67 case, which I think sets this out in great detail. What you're looking for is, are the children so aligned with a particular community that that's where they get their opportunities to go to the library, the park district, the sports teams, after school programs, all those things that make up other parts of education other than just going and reading your books, and are you so affiliated with them that if we don't let you go there, you're not really going to school with the kids that you do stuff with every day. The evidence that they provided here was from three witnesses who were all adults, and they talked about the fact that they sometimes shop in Piatone for groceries, sometimes get their car work done in Piatone for groceries, but absolutely nothing about children. They didn't talk about Piatone's programs, they didn't know what they offer, they didn't talk about anything, and it's before considering the fact that they're in Monee, and they're talking about leaving Monee, which is part of the Creek Monee School District, to go to Piatone. They're leaving their natural community of interest to go to another one.  So even though they couldn't consider the evidence, the evidence that they did consider doesn't meet what the whole child or community of interest factors are under the Supreme Court's holdings anyways. So it's a second basis for reversible error. And the last one is that the Section 7-6... I'm out of time. I was going to say that they considered travel time between schools, which is precluded by the statute as well, to support the detachment petition, so that's the third statutory violation, and because of all these violations, we think that their order should be reversed. Thank you. Mr. Boland? Good afternoon. Good afternoon. May it please the Court, my name is Dan Boland, and I represent parents and residents of a small, unincorporated community in southeastern Will County called Meadow Creek. 82% of the adults that live there signed a petition to detach from Crete-Moniz schools and annex to Piatone. We respectfully ask that this Court affirm the Regional Board's decision and the Circuit Court's decision finding that the Board had jurisdiction to hear this petition and that the petition met the standards for detachment. But first, all of Crete-Moniz's claimed errors could have been addressed through rehearing before the Board, but Crete-Moniz denied the Board that opportunity by proceeding directly to administrative review in Circuit Court. The school code specifically provides that any person served with an order may petition for rehearing within 10 days after service of a certified copy of the order. But does the statute counsel provide that if you don't petition, you are prohibited from going straight to an administrative review? No, but even when the requirement of rehearing is couched in permissive language like that in other statutes, courts have found that those, that remedy must be exhausted before proceeding to Circuit Court because where administrative rules allow  the party must do so in order to exhaust its administrative remedies and preserve its right to seek judicial review. Was that raised at the trial court? It was raised in the Circuit Court, yes. You mean in the Circuit Court? It was raised at the, in response to the administrative review complaint. We filed a motion to dismiss on that basis. That motion was denied. We'd ask that the Circuit Court be reversed on that motion. Counsel, there was originally a cross appeal which was stricken. Is that what the cross appeal was about? It was. Out of an abundance of caution, we filed a cross appeal on this issue. The appellants responded that they would allow us to be heard, that we would not have waived that issue in response to their our cross appeal. So, thank you. They're going to respond pointing to the cases like Stroob and Land O'Lakes and Seelhofer. These are factually distinguishable cases. In this case, it was a 4-3 vote. We would have only taken one decision, one vote, a change of one vote to change the outcome of this hearing. Those cases that they cite were unanimous or nearly unanimous decisions. So, the Supreme Court's decision in Castaneda is binding in this case. That stands for that principle that we must exhaust your administrative remedies in cases like this. To the petition itself, we do believe that the petition met the standards. First, the Board correctly concluded by preponderance of the evidence that detachment would improve the direct educational welfare of Meadow Creek students because attending school in a more disciplined, safer environment clearly outweighs the detriment of attending a school with fewer AP honors. Counsel, that contention was based on expert testimony that relied on pretty exclusively the school report card which is not which the statute does not allow to be considered. How do you address that issue? Sure. So, the Board did not admit the report cards directly into evidence. The Meadow Creek expert used limited report card data, just facts on enrollment and suspension in formulating her opinion. This was not the kind of comparison of school report card data that's prohibited by the statute. The Board did not admit that school code amendments limiting the use of report card comparisons were adopted in response to Merchant versus the Regional Board of School Trustees. In the Merchant case, the petitioners compared all the criteria in the school report cards. But is there any such limiting language in the statute? That's not the kind of comparison that was adopted that the General Assembly contemplated when they adopted the limitation. Did they put that language into the statute? They also don't say data in the statute. And so, to Justice Holdred's point, how are we supposed to look up and understand basic facts about the schools? It would be arbitrary decision making. The General Assembly intended to make it more difficult to prove these detachment cases, but not to make it impossible. Under the Crete-Moniz construction of the statute, we wouldn't be able to look at basic enrollment data, basic suspension information. And under the Utica case, we're supposed to consider safety. And that's what the Board did in this case. And so, this is not like the Roxanna case where the report cards were admitted directly to evidence for all purposes. The Board also didn't compare the state's summative designation for the schools or the school districts on the report cards. You would have to take judicial notice that such things exist because the report cards aren't in the record. But the state describes these schools as exemplary schools or commendable schools. That didn't happen in this case. That's not the type of comparison that happened or was prohibited that happened in this case. And even if the statute would prohibit the use of data from the report cards, the Meadow Creeks expert was entitled to rely on that data, which may have not otherwise been admissible. Crete-Moniz... Let's see. Yes. I am curious about that last statement. Sure. That they can rely on the data, the expert can foundationally rely on the data, that opposing counsel is saying cannot be considered. Right. To form the basis of her opinion that even though the school is less disciplined. And there's benefits from attending school in a more disciplined environment. And so she would look at those facts to form the basis for her opinion. I'm confused, counsel, because the statute says when considering the effect the detachment will have on the direct educational welfare of the pupils, the regional board of school trustees shall consider a comparison of the school report cards for the schools of the detaching and annexing districts and the school district report cards for the detaching and annexing districts only if there is no more than a 3% difference in the minority, low-income, and English learner student populations of the relevant schools of the districts. So when you are saying when your expert was testifying that the disciplinary experience record in the Crete-Moniz school district is more troubling than the disciplinary record in the Piatone school district, isn't that, how can that not be a comparison of the school districts based on the school report cards? So in Merchant, the comparison of school report card data looked at every single criteria and said this school is better in 84 categories and that school is better in these 46 categories. But Merchant predates this amendment to the statute. Right. It's not an interpretation of this language of the statute. But the statute was adopted in response to Merchant. And so that's why what the General Assembly had in mind when they were adopting the statute and what they mean by comparison and how we're supposed to understand what the General Assembly was thinking of what they mean by the term comparison. And in this case, we're looking at narrow factual data just on, I don't know how else we would get these basic facts about these schools to evaluate whether they should be detached and whether there's a direct educational benefit. Which the board was very concerned about the safety issues raised and discipline issues raised in these schools.  they did look at all of the curriculum and classes offered at Preet Mooney. But it didn't make a difference if those offerings couldn't take place in a safe environment. And what's more, the board also looked at the whole childhood community and the interest factors. Prior to deliberations, the hearing officer advised the board it must first determine there is a significant direct educational benefit before considering those factors. The board's final order didn't use the word significant in its description, but the board would not have proceeded to consider these factors if it didn't find the educational benefit to be significant. This is not like the Medina case that had no explanation or finding for its decision. The board's decision in this case was supported by extensive findings even though findings only needed to be sufficient to permit adequate judicial review. And so, the whole child first, and the whole childhood community and interest factors first, the board found that attending school in a more disciplined, safer environment outweighs the fact that Preet Mooney offers more extracurricular programs. Additionally, Meadow Creek's proximity to Piatone makes it more likely that students will participate in extracurricular activities. And Meadow Creek parents who send their children to private schools stated they would enroll their children in Piatone schools. And none of them affirmatively said they would state that they would enroll their children. They said they might as I recall the testimony. Is that correct? I think they did. It said that Mr. Huber from Meadow Creek states he would enroll his children in Piatone. Mr. Thompson states he would enroll his children in Piatone. This is at in the record 4977, 4992, and 5003, volume 8. And Mr. Welch stated he would likely enroll both of his children. One of his sons may need special accommodations. And looking at the overall statistics, currently only 46% of Meadow Creek parents send their children to private schools. 46% of Meadow Creek parents send their children to private schools compared to the national average of 10%. The board found the unbuttoned evidence shows that Meadow Creek identifies more closely with Piatone. Meadow Creek residents shop in Piatone. It takes much less time to travel from Meadow Creek to Piatone than it does to travel from Meadow Creek to Creek. Was it proper for them to consider the time when the distance was so little? They considered it as part of the prohibitions on considering travel time to attendance centers. You could still consider transportation time as part of the whole child community of interest analysis. And the board's order acknowledged it didn't consider travel time to attendance centers. And while school districts may not be changed solely by shopping, banking, or school preferences, the board properly considered these preferences as one factor of this analysis. And then finally, Meadow Creek residents travel to Piatone more frequently and do their shopping there. And that the board found that the evidence was unbuttoned in terms of identification with Piatone. And then... What about the children? Their identification with Piatone? Right, in terms of they would be more likely to participate in extracurricular activities based on their family's identification with Piatone. I think that's what the board found. And then so... With my remaining time, I do want to respond to the harm to Creep Monee. They would just lose 1% of their budget. This is only a loss of, we're talking about 14 students. There's no evidence presented that the loss of revenue resulting from detachment would leave Creep Monee unable to meet the state's standards of recognition. Especially where Creep Monee's Illinois annual financial score has been historically in the highest or second highest rating of recognition. There's testimony that the EAV in Creep Monee is the highest it's ever been. There's TIFs, tax increment financing districts that were rolling off that would bring Creep Monee additional revenue. And not to mention the facilities. The Creep Monee's facilities regularly experience flooding or temperature regulation in the winter and spring. Old plumbing, restricting drinking water. Could you speak up? Sure. And minimal air conditioning leading to more remote learning days for students. And so there was discussion in the hearings about a $99 million dollar referendum that failed. I know that Creep Monee will point out that the schools in Monee are in better condition, but the schools overall in the district have serious capital improvement needs. And I see my time is up. And thank you for your time. Thank you. Are there any questions? Mr. Gleason. Thank you, Your Honor. Just to jump right back in on the facilities question. They're presenting a red herring to the court. The facilities that the students in this residential area would attend, the record shows that they're all exemplary. The facilities are great. The facility issues that Crete has are with facilities that these students would never attend. So it's really irrelevant in the analysis of whether it's going to benefit this particular subdivision because they're never going to go to these schools. But even more importantly, you have to compare and contrast the facilities that we have with where they're seeking to go. And they didn't put on any evidence of what the facilities are like in Piatone. So they can't say that the facilities in Piatone are better or any different because they don't know and they didn't put on any evidence of it. So there's nothing to compare or contrast. Getting back to the failure to exhaust question, it's a very narrow question that they're presenting to the court. They're presenting the question to the court of when there's a discretionary ability to seek a red herring, do you have to seek it in order to be considered to have exhausted your discretion in Truby and this court's holding in Land of Lakes. And both of those cases are interpreting the Illinois Supreme Court's holding in Castaneda, which is where this argument is coming from. And in Castaneda itself, they specifically distinguish the situation where they looked at the fact that you never have to go back to the same court or the same appellate court panel and seek a red herring before you go to the next level. And that's really what the Griglio decision out of the 4th District was focusing on, is you're making the same exact arguments to the same exact group of people who have just heard them over several nights and have seen them in writing and you've made oral arguments to them, you're just giving them what you've already provided to them. And that's consistent with what the United States Supreme Court holds in Levers v. Anderson, which is where the state is borrowing all of this exhaustion red herring for. You never have to go in front of the same tribunal. In Castaneda, it was a different tribunal. It was a much larger tribunal. So the cases that they're relying upon are all 1st District cases. They're all out of the Department of Insurance. And the foundational holding is in Illinois Health Maintenance Organization Guarantee Association v. SHAPO. And it in itself says our opinion is limited to what we determine to be a mandatory administrative code obligation to seek rehearing. We think that there's multiple exceptions to the doctrine that would apply. The biggest one, I think, is that we don't believe that there's agency expertise at issue here. The bulk majority of the questions that we present at the court here are legal quandaries. Could they consider certain evidence or should they have been not allowed to do that? That's a question for a court. It's not anything that has agency expertise that we cited Trilisky v. the State of Chicago and, of course, the Office of Cook County State's Attorney. The Illinois Supreme Court makes that clear. Where the main thing that you're reviewing is statutory construction, that doesn't involve agency expertise, especially for an agency like this. This is not the Department of Insurance, nor is it the Illinois Human Rights Commission. The people who run for this position don't have to have any experience or know anything about schools. They have to be of a certain age. They have to live in a certain area. Actually, they cannot work at a school, which is another argument we raised at the court that we're not going to have time to get to, but they're almost walking away from expertise. They don't have expertise, and there's multiple of these agencies throughout multiple counties that can interpret the statute any which way they want. There's no entity that the state has created to look at one particular issue. We also raised issues to the jurisdiction, which we believe are an exception, and we also think it was patently futile. We've put forth an argument to the court here that the members, when they deliberated publicly, talked about evidence that they went and sought on their own, outside of the record, and discussed this as part of their deliberations. We think that was tremendously unfair, and when you all were trial court judges, that's the first thing you tell the jury at the end of every day is, don't look at evidence outside of the record, and these folks got the same admonishment from their counsel, but that's exactly what they did, and when you do that and you look at this evidence and you bring it up in deliberations, what you do is you deprive a party of the opportunity to respond, and so that was particularly important here when they discussed bond issues and the fact that they could be refinanced, or that if you did refinance them, you would actually save money, they don't know what the calls were on the bonds, they don't know anything about the bonds. We had our CSBO testify, they could have asked them questions, but they didn't, they said you all should have refinanced the bonds without any evidence, so they deprived us of an opportunity to put on information about that because we didn't know was it an issue, because the petitioners didn't raise it as an issue, and the last argument that we raised is that we believe it was an unlawfully constituted board because one of the members during the proceedings became conflicted under the school code and was no longer eligible to sit under section 6-3, and for all these reasons, we would ask you to reverse the decision of the regional board and the circuit court, and I thank you for your time. We thank both of you for your arguments this afternoon. We'll take the matter under advisement, and we'll issue a written decision as quickly as possible.